# In the United States Court of Federal Claims

No. 10-725C

(Filed Under Seal: January 21, 2011)

(Reissued for Publication: January 31, 2011)[1]

*******************************************  *
                                             *
                                             *
FULCRA WORLDWIDE, LLC,                        *
                                             *  Post-Award Bid Protest; Lowest
                  Plaintiff,                  *  Price Technically Acceptable
                                             *  Source Selection Method; Effect of
v.                                           *  Significant Price Differences;
                                             *  Allegations of Relaxed or Changed
THE UNITED STATES,                            *  Requirements; Agency Evaluation
                                             *  of Technical Proposals; Price
                  Defendant,                  *  Realism Analysis; Bait and Switch
and                                          *  Allegation Regarding Proposed
                                             *  Key Personnel; Supplementing the
SOS INTERNATIONAL, LTD.,                      *  Administrative Record.
                                             *
                  Defendant-Intervenor.       *
                                             *
*******************************************  *

*Daniel S. Koch*, with whom were *Arthur G. House*, and *Kevin K. D'Anna*, Paley Rothman, Bethesda, Maryland, for Plaintiff.

*Kenneth S. Kessler*, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Deborah A. Bynum*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., *Captain Edward Ahn*, U.S. Army Legal Services Agency, Of Counsel, for Defendant.

*Alison L. Doyle*, with whom was *Marques O. Peterson*, McKenna Long & Aldridge LLP, Washington DC, for Defendant-Intervenor.

---

[1] The Court issued this opinion under seal on January 21, 2011, and gave the parties until January 28, 2011 to submit any proposed redactions of competition-sensitive, proprietary, confidential or other protected information. Pursuant to the Court's request, the parties submitted proposed redactions, which the Court accepted. Many of the redactions are the names of individuals. These names have been replaced with [Mr A], [Mr. B], etc. Redactions that are not the names of individuals are indicated by [ . . . ]. The Court also corrected a typographical error in Section D, "Court Proceedings," of the Background.

<u>OPINION AND ORDER</u>

WHEELER, Judge.

In this post-award bid protest, Plaintiff Fulcra Worldwide, LLC (Fulcra) challenges the Department of Defense CENTCOM Contracting Command's award of a contract to SOS International, Ltd. (SOSi) for strategic communication management services (SCMS) in Iraq. Fulcra is the incumbent contractor, having held an SCMS contract with CENTCOM for approximately the past three and one-half years. CENTCOM used a lowest price, technically acceptable source selection method in awarding the contract. SOSi submitted the lowest price. CENTCOM performed a technical and past performance evaluation of SOSi's proposal and found it acceptable. Thereafter, CENTCOM awarded the contract to SOSi on June 9, 2010. When the agency debriefed Fulcra on June 10, 2010, Fulcra discovered that SOSi's proposed price was significantly lower than Fulcra's proposed price. Fulcra filed a protest with the agency on June 16, 2010, and then with the Government Accountability Office (GAO) on June 25, 2010. CENTCOM agreed to take corrective action by performing a technical evaluation of all of the six proposals received. SOSi and Fulcra were the only offerors that the agency found technically acceptable. CENTCOM confirmed its award to SOSi as the lowest price offeror. Fulcra refiled its protest at the GAO on July 22, 2010. The GAO summarily dismissed all but one of Fulcra's protest grounds on July 28, 2010. Fulcra then filed a supplemental protest on September 2, 2010. On September 7, 2010, the GAO dismissed seven of Fulcra's nine supplemental protest grounds. Fulcra filed its action in this Court on October 26, 2010, before the GAO had issued any decision on the merits.

Fulcra's protest is based mainly on an answer that CENTCOM provided to one of Fulcra's questions during the solicitation process. CENTCOM stated that the effort required under the new solicitation was "largely similar" to the scope of the existing bridge contract being performed by Fulcra. When Fulcra later learned at the debriefing of SOSi's much lower price, Fulcra doubted that SOSi could actually perform a "largely similar" effort at the quoted price. Fulcra therefore alleges in counts one through four of its complaint that: (1) CENTCOM should have found SOSi's proposal technically unacceptable because SOSi could not provide "largely similar" services to the bridge contract at the price offered; (2) CENTCOM must have relaxed the technical specifications for the benefit of SOSi, again because "largely similar" services could not be provided at SOSi's low price; (3) CENTCOM did not notify offerors of any change in requirements, yet the requirements must have changed if SOSi's proposal was deemed technically acceptable; and (4) the solicitation must have contained a latent ambiguity if it can be read to accept SOSi's proposal for services of a much lower quantity and quality. Count five of Fulcra's complaint alleges CENTCOM failed to perform a rational price realism analysis of SOSi's low price.

Fulcra's protest also contains a count six, alleging a "bait and switch" violation. Fulcra asserts that SOSi submitted resumes for key personnel that it either did not intend to use on the contract, or did not know whether the proposed personnel would be available to work on the contract.

The Court considered this protest on an expedited basis.  Defendant submitted the administrative record on November 8, 2010, and later amended the record with filings on November 12, November 16, December 6, and December 13, 2010.  The Court permitted Fulcra to conduct discovery on its "bait and switch" allegation, allowing depositions to determine whether SOSi had committed any improprieties in providing key personnel resumes in its proposal.  Counsel for Fulcra persuaded the Court that this information would not be found in the administrative record, but would only be known by former or current SOSi representatives and the proposed personnel.  The Court held an evidentiary hearing on December 14, 2010 to receive testimony and documentary evidence relating to Fulcra's count six.  However, as explained below, the Court denied various other requests to supplement the administrative record.

In order to allow Fulcra to conduct discovery on the "bait and switch" allegation and also to proceed with the other counts on an expedited basis, the Court required separate briefing on counts one through five, and count six, respectively.  Under this approach, the parties briefed counts one through five as the depositions were proceeding as to count six.  After all briefs had been submitted, the Court heard oral argument on all six counts on December 29, 2010.  At the close of argument, the Court provided a bench ruling, to be followed by this opinion.

In brief summary, the Court finds that Fulcra's protest is without merit.  If Fulcra actually relied on CENTCOM's "largely similar" response to the extent it alleges, such reliance was unreasonable.  The best way to compare the scope of work of the bridge contract and the new contract is to study the respective requirements in detail, and to prepare a detailed analysis of the differences.  The phrase "largely similar" is vague and imprecise, and potentially has a range of different meanings.  The Court cannot accept Fulcra's contention that the agency's "largely similar" characterization should substitute for a careful review of the actual requirements.  Moreover, CENTCOM reviewed SOSi's price and proposed method of performance, and found that the requirements could be met at SOSi's lower price.  The Court will not substitute its judgment for that of the agency in this regard, so long as the Court finds the agency's determination to be reasonable.  Finally, even after depositions and an evidentiary hearing, Fulcra was not able to prove its "bait and switch" allegation.  Accordingly, Fulcra's protest is denied, and the Court will enter judgment for Defendant.

Background[2]

A. The Solicitation

1. Description of Services

On May 15, 2010, the Joint Contracting Command – Iraq/Afghanistan, now called CENTCOM Contracting Command, issued Solicitation No. W91GDW-10-R-0011. Administrative Record (AR) 148-232.  The solicitation was for a commercial firm-fixed price contract for strategic communication management services (SCMS).  AR 9.  The anticipated period of contract performance was eight months beginning on July 23, 2010, with one nine-month option period.  Id.  The solicitation described the services to be acquired as follows:

> [T]he Strategic Communications Management Services contract will obtain the services of a contractor to ensure current and thorough understanding of our communication environment, conduct accurate assessments, develop communications strategies and tactics, identify opportunities, and execute events to pursue the strategic engagement of our desired audiences. Additional goals are to effectively build US decision makers' and the public's understanding of Iraq's current situation, future and strategic importance as a stabilizing presence and ally against terrorism in the middle east.

AR 157.  The statement of work also described five tasks that the contractor would perform:  (1) Media Monitoring, Assessment, and Reporting; (2) Communication Research and Planning; (3) USF-1 Spokesman Media Advisor/Speechwriter; (4) USF-1 English & Arabic Web Site Management & Maintenance; and (5) Government of Iraq Liaison.  AR 161-170.

2. Method of Evaluation

CENTCOM stated in the solicitation that it would use a lowest price technically acceptable (LPTA) source selection method in accordance with Federal Acquisition Regulation (FAR) 15.101-2.  AR 227.  Offerors would be evaluated based on three factors:  (1) Cost/Price, (2) Technical Proposal, and (3) Past Performance.  Id.  The solicitation explained that price would be evaluated first and offers would be listed from lowest to highest price based on total evaluated price.  AR 228.  After the price evaluation, the agency would begin its technical evaluation, starting with the lowest priced offeror.  Id.  The lowest priced proposal exceeding acceptability standards for non-

---

[2] Except for the evidentiary hearing before the Court, the following factual references are drawn from the administrative record.  See Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

cost factors would be considered the successful offer and all remaining technical evaluations would cease.  Id.

For the price evaluation, CENTCOM added the price for each contract line item number (CLIN) by multiplying the proposed unit price by the estimated quantity for each respective CLIN.  AR 228.  The solicitation provided that CENTCOM would conduct a price analysis for each offeror's total evaluated price:

> Unrealistically low proposed cost/prices may be grounds for eliminating a proposal from competition either on the basis that the offeror does not understand the requirement or the offeror has made an unrealistic proposal. In the event that the Government determines the offeror's price to be unrealistically low, it may use that information in the technical approach evaluation as evidence that the offeror lacks understanding of the requirement.  Price Analysis techniques may include a comparison of the proposed prices received in response to the solicitation, comparison with other contract prices for similar services, and/or a comparison of proposed prices with the Independent Government Cost Estimate.

Id.

For technical acceptability, CENTCOM would rate proposals based on seven subfactors as either acceptable or unacceptable.  Id.  If one or more subfactors were rated unacceptable, the entire technical proposal would be rated unacceptable.  Id.  The seven subfactors were: (1) Media Monitoring, Assessment, and Reporting; (2) Communications Research and Planning; (3) USF-1 Spokesman Media Advisor and Speechwriter; (4) USF-1 English and Arabic Website Management and Maintenance; (5) Government of Iraq Liaison; (6) Media Space Assessment and Media Engagement Strategy; and (7) Transition Project Plan and Management Plan.  AR 228-31.  For the first five subfactors, the agency would evaluate proposals based on the offeror's understanding of the personnel required for the task.  AR 228-30.  For these five factors, offerors were required to submit the resumes of key personnel who would be assigned to perform the task.  Id.

For past performance, CENTCOM would evaluate offerors on: (1) whether the offeror had been terminated for default during the past three years; and (2) whether the offeror had a "pass" or "neutral" rating on all past performance questionnaires, or whether the offeror had no past performance rating.  AR 231.

### 3.  Solicitation Amendments

CENTCOM issued two amendments to the solicitation.  In Amendment 001, the agency extended the deadline to submit questions from May 19 until May 22, 2010.  AR

220, 233-39.   In Amendment 002, CENTCOM answered questions that prospective offerors had submitted.  AR 240-74.  The second amendment also included a modified statement of work and statement of the evaluation criteria.  Of the 64 questions answered in the second amendment, two questions are relevant to this bid protest.

| Question | Answer |
|---|---|
| Are these services currently being performed through the bridge contract W91GDW-10-C-0004? | Yes, this effort is largely similar to the bridge contract W91GDW-10-C-0004. |
| Page 11, Section 2.0 (Scope), 2nd paragraph.  The RFP states that "The contractor supporting all tasks, with the exception of USF-I English and Arabic Website Management and Maintenance will primarily perform assigned tasking co-located with J9 Strategic Communications staff."  However, in section 4.0, Summary of Requirements, the RFP states that "The services described in this section shall be provided in the most cost effective manner either in theater or in other locations as mutually approved by the contractor and Contracting Officer."  Q: can the contractor propose a combination of CONUS and OCONUS[3] personnel and be evaluated as technically acceptable? | Yes, however proposal should clearly show what portions of tasks would be performed OCONUS, which CONUS, how a cohesive govt-contractor team will be formed, and how time zone issues will be overcome for critical tasks.  The government reserves the right to increase in theater support if quality/timeliness of support is affected by insufficient in theater support, without an increase in price. |

AR 260-61.

    B.  CENTCOM's Award Decision

        CENTCOM received six offers in response to the solicitation.  AR 275.  SOSi offered the lowest evaluated price of $2,654,343.57.  AR 618.  Fulcra offered the highest evaluated price of [ . . . ]  Id.

        Because SOSi submitted the lowest price, the Technical Evaluation Team (TET) evaluated SOSi's proposal first.  AR 617-18.  The TET consisted of five members of CENTCOM's program office with the team leader being the contracting officer's representative.  AR 714.  As part of its technical proposal, SOSi listed [ . . . ] key personnel and submitted [ . . . ] resumes.  AR 21-23, 61-87.  Among the personnel listed

---

[3]  "CONUS" and "OCONUS" stand for "Continental United States" and "Outside the Continental United States" respectively.

were Adam Fife, [Mr. I], and [Ms. F].  AR 21-22.  The TET found SOSi's technical proposal to be acceptable.  AR 617-18.  The agency also reviewed SOSi's past performance record, and found it acceptable.  Id.  No other proposals were evaluated for technical acceptability or past performance, and CENTCOM awarded Contract No. W91GDW-10-C-0009 to SOSi on June 9, 2010.  AR 617-18, 632-89.

CENTCOM's contracting officer, in his award decision document, also conducted a price analysis.  SOSi's total evaluated price was significantly lower than the Independent Government Estimate (IGE) of $8,250,284.50.  AR 618.  The contracting officer observed that all the proposed offers were at least [ . . . ] percent lower than the IGE.  Id.  The contracting officer explained that the IGE price was constructed by extrapolating prices from the bridge contract (W91GDW-10-C-0004) and the SMCS IDIQ contract (W91GER-D6-D-0009), also awarded to Fulcra, to estimate mobilization costs.  Id.  The contracting officer analyzed the difference between the IGE and the six proposed prices as follows:

> This can be explained by changes in the requirement and a very thorough review and revision of the Statement of Work compared to the previous contract.  The revised statement of work more clearly specified the requirements and allowed a greater percentage of effort to be completed CONUS as opposed to the Iraqi theater.  In addition, the maturity of the effort as well as the reduced risk environment has enabled a reduction in prices.

Id.  The contracting officer also found that SOSi's total evaluated price was [ . . . ] percent lower than the next lowest evaluated price.  Id.  Nevertheless, the contracting officer found SOSi's price reasonable.

> [B]ased upon a review of the entire proposal it is determined that this is most likely due to SOSi placing a greater emphasis on performing work CONUS [ . . . ] where costs are substantially reduced.  Finally, SOSi appears to be relying on capabilities previously developed and fielded in support of other efforts, as evidenced by their use of a modified version of [ . . . ], significantly reducing their development costs.  As long as this approach is found to be technically acceptable by the Technical Evaluation Team, then price reasonableness can be reasonably ascertained.

Id.

C. Post-Award Challenges

1. Agency Protest

CENTCOM provided a debriefing to Fulcra on June 10, 2010.  AR 690.  In the debriefing, the contracting officer explained that Fulcra's technical proposal and past performance were not evaluated because SOSi, the lowest priced offeror, submitted a technically acceptable proposal and received an acceptable past performance rating.  Id. On June 16, 2010, Fulcra filed an agency level protest with CENTCOM, raising five grounds of protest centered mainly on SOSi's low price.  AR 708.1-708.10.

CENTCOM responded to Fulcra's agency protest by letter dated June 18, 2010. AR 704-08.  The contracting officer pointed out that while "the Government may eliminate a proposal on the basis of concerns of price realism, it does not obligate the Government to do so."  AR 705.  Here, the TET thoroughly evaluated SOSi's proposal and determined that SOSi understood the technical requirements.  Id.  Furthermore, CENTCOM "took into account the unique merits of the awardee's technical solution as a means of significant cost savings."  Id.  The contracting officer also addressed Fulcra's assertion that it could not have awarded a contract "largely similar" to the bridge contract to SOSi at the award price.

> Fulcra's assertion fails to recognize that while the deliverables, and quality and quantity of said deliverables are "largely similar" to the bridge contract, the manner in which those services are provided is not mandated by the solicitation to be fundamentally similar to the Fulcra technical solution.

AR 706.

2. First GAO Protest

On June 25, 2010, Fulcra filed a protest at the GAO.  AR 693-703.  On July 13, 2010, the contracting officer informed the GAO that the agency intended to take corrective action by evaluating all six proposals.  AR 13.  If after the new evaluation, SOSi was no longer the lowest priced and technically acceptable offeror, he would terminate the contract for convenience and award the contract to the new successful offeror.  Id.  Accordingly, the GAO dismissed the protest.  AR 623.

In the new evaluation, CENTCOM evaluated all six offerors to determine if their technical proposal and past performance were acceptable.  AR 626-27.  The TET concluded that only two proposals were technically acceptable, Fulcra's and SOSi's.  AR 627.  All six offerors had acceptable past performance.  Id.

The contracting officer again analyzed SOSi's price, finding that the price was reasonable and realistic.   AR 627-29.   The contracting officer stated that "SOSi's proposal demonstrates a significant degree of familiarity with the nuances of operating in the area of responsibility, as evidenced by their experience in executing the Iraqi Advisor Task Force (IQATF) and the Foreign Media Analysis (FMA) contracts as described in their proposal."   AR 627.   Furthermore, the contracting officer found that "SOSi's proposal demonstrates a high degree of familiarity and experience with many of the core tasks associated with SCMS services so as to inspire significant confidence that the proposed price is based on a proper understanding of the requirement."   AR 627-28.   The contracting officer also found that SOSi was able to perform the same deliverables [ . . . ] and that SOSi's proposal relied heavily on solutions developed and fielded in support of other efforts.   AR 628.   Using LPTA source selection procedures, the contracting officer again determined that SOSi's offer "is the most advantageous offer for the U.S. Government."   AR 630.

### 3. Second GAO Protest

On July 22, 2010, Fulcra renewed its protest at the GAO, asserting six grounds of protest.   AR 461-74.   The first was that SOSi's price was unrealistic.   AR 465-66. Second, Fulcra alleged that SOSi's proposal was technically unacceptable.   AR 466. Third, to the extent that CENTCOM accepted a proposal from SOSi offering lower levels of services than Fulcra is currently providing, CENTCOM impermissibly relaxed the mandatory technical specifications.   AR 467.   Fourth, CENTCOM accepted a proposal from SOSi offering a lower level of services, revealing that the solicitation had a latent ambiguity.   AR 467-68.   The fifth and sixth grounds of protest related to specific tasks for which CENTCOM allegedly had accepted a proposal that was not "largely similar" to the bridge contract.   AR 468-70.

On July 28, 2010, the GAO dismissed protest grounds two through six as factually and legally insufficient.   AR 474.1.   The GAO found that "a protester's mere inference and speculation is insufficient to establish a valid basis of protest."   Id.   Thus, the GAO stated that the agency report only had to address the first protest ground.   Id.

On August 23, 2010, CENTCOM submitted the agency report.   AR 130-39.   On September 2, 2010, Fulcra filed a supplemental protest alleging nine new grounds for protest.   AR 563-79.   Seven of the new grounds pertained to whether the contract award to SOSi was "largely similar" to the bridge contract.   Id.   Fulcra also added "bait and switch" and organizational conflict of interest allegations.   AR 565-67, 571.   For the "bait and switch" allegation, Fulcra alleged that SOSi misrepresented to CENTCOM the key personnel to be employed on the contract.   AR 565.   The supplemental protest included a declaration from [Mr. A].   AR 577-78.   [Mr. A] stated that on August 27, 2010, he received unsolicited telephone calls from two former senior SOSi executives with knowledge of the technical proposal, one of whom had been involved in preparing it.   AR

577.  In those and other conversations, the informants told [Mr. A] that SOSi did not plan to use the key personnel listed in the proposal, but instead planned to hire employees from Fulcra.  AR 577-78.  [Mr. A's declaration] specifically mentioned [Mr. B, Mr. C and Mr. D].  Id.

On September 7, 2010, the GAO dismissed all of the protest grounds relating to the statement in Amendment 002 that the current SMCS contract is "largely similar" to the bridge contract.  AR 582.41.  The GAO stated:

> The comparison here goes to the scope of work being performed, not the means and methods being employed by Fulcra to accomplish the bridge contract statement of work.  The Q&A did not say, nor does it stand for the proposition, that offerors' staffing levels here had to be "largely similar" to Fulcra's staffing on the bridge contract.  Likewise, the RFP established that the agency's technical evaluation would be based on whether an offeror's proposal successfully demonstrated the ability to perform the statement of work requirements, not whether an offeror's proposal was "largely similar" to Fulcra's incumbent staffing.  To the extent Fulcra believes the RFP required offerors to propose means and methods of performance (i.e., staffing) "largely similar" to that being employed on its bridge contract, such an interpretation of the solicitation is not a reasonable one.

Id.

The GAO did not dismiss the "bait and switch" allegation.  Id.  For this allegation, the contracting officer submitted a supplemental statement of facts on September 9, 2010.  AR 562.  The contracting officer stated that even after reading [Mr. A's] declaration: "I still do not have grounds to believe that SOSi made any misrepresentations in their staffing proposal."  Id.  Before the GAO issued any decision on the merits, Fulcra filed its action in this Court.  (Compl. ¶¶ 23-24.)

D.  Court Proceedings

On October 26, 2010, Fulcra filed its complaint, asserting six counts: (1) the agency failed to follow the evaluation scheme in the RFP by failing to determine that SOSi's proposal was technically unacceptable; (2) in order to accept SOSi's unreasonably low priced proposal, the agency relaxed the minimum technical specifications stated in the RFP; (3) the agency failed to notify Fulcra that it had changed its requirements; (4) the agency failed to correct a latent ambiguity; (5) the agency should have found SOSi's price unrealistic; and (6) SOSi committed a "bait and switch" violation.

Fulcra filed a motion for discovery as to count six. Fulcra argued that, if allowed limited discovery, it could prove that a "bait and switch" had occurred. (Mot. for Disc. 4.) Fulcra relied on the same declaration from [Mr. A] submitted to the GAO, stating that he had received unsolicited telephone calls from two former senior executives at SOSi. [Mr. A] learned that SOSi allegedly lacked qualified persons for key positions in this procurement, and therefore intentionally submitted resumes for key positions of persons it did not intend to use on the contract. (Mot. for Disc. 5.) For this motion, Fulcra no longer included [Mr. B] in the "bait and switch" allegations. Fulcra alleged that SOSi misrepresented the status of four key personnel, Adam Fife, [Mr. E], [Ms. F], and Bill Dixon. (Mot. for Disc. 5-6.) The Court heard oral argument on Fulcra's discovery motion on November 10, 2010. The Court granted the motion at the oral argument, determining that Fulcra had a good faith basis for its "bait and switch" allegation and that Fulcra should be given the opportunity to pursue the potential factual support. (Nov. 10, 2010 Hr'g Tr. 14-15.) Fact information relating to this allegation likely would not be found in the administrative record. Id. at 14.

The Court held an evidentiary hearing on Fulcra's "bait and switch" allegation on December 14, 2010. At the hearing, the Court heard the testimony of four witnesses, Adam Fife, former Vice President of Business Development at SOSi, [Mr. G], former [ . . . ] at SOSi, [Mr. H], [ . . . ] at Fulcra, and Luke Pingel, Corporate Counsel for SOSi. See generally December 14, 2010 Hr'g Tr. ("Hr'g Tr."). At the evidentiary hearing, Fulcra presented evidence on a "bait and switch" violation for a different set of people than it had alleged in its motion for discovery. Fulcra did not present any evidence regarding Bill Dixon or [Mr. E], but focused instead on the availability of [Mr. I], [ . . . ], Mr. Adam Fife, SOSi's proposed Project Director, and [Ms. F], SOSi's proposed [ . . . ].

For [Mr. I], Fulcra showed that he is the CONUS [ . . . ] for one other project. (Hr'g Tr. 32.) SOSi's technical proposal did not state explicitly that [Mr. I] would be a part-time CONUS [ . . . ]. (Hr'g Tr. 33.) Mr. Fife testified, however, that SOSi's pricing showed [Mr. I] to be only part-time on the project. Id. Mr. Fife also pointed out that the solicitation did not require an offeror to state whether a position was part-time or full-time. (Hr'g Tr. 39.) Mr. Fife explained that the SCMS contract did not require a full-time CONUS [ . . . ] because it was a small program and [Mr. I] had a full corporate staff to support him. (Hr'g Tr. 40.)

For Mr. Fife, Fulcra showed that he planned to set up the program as Project Director and then leave the project. (Hr'g Tr. 22-24.) However, Mr. Fife testified that he would only leave the program if the agency consented. (Hr'g Tr. 24.) If the agency asked Mr. Fife to stay as Project Director, he would have stayed. (Hr'g Tr. 36-37.) Mr. Fife also testified that as of December 6, 2010, he started his own business and no longer worked for SOSi. (Hr'g Tr. 13, 32.) Fulcra also called [Mr. G] and [Mr. H] for the purpose of demonstrating that Mr. Fife would only serve as Project Director for a short period. [Mr. G] testified that, due to Mr. Fife's critical position at SOSi, Mr. Fife would

only stay in Iraq for a couple of weeks.  (Hr'g Tr. 67-70, 72.)  [Mr. H] testified that in approximately June 2009, Mr. Fife told him he was not interested in going back to Iraq on an extended basis because he had a new wife and infant child.  (Hr'g Tr. 113-14.)

For [Ms. F], Fulcra presented evidence that Mr. Fife did not speak to [Ms. F] about going to Iraq before submitting her resume in the SCMS proposal.  (Hr'g Tr. 19-20.)  Mr. Fife presumed that [Ms. F] was willing to participate because she had agreed to go to Afghanistan for the exact same position.  Id.  On examination by SOSi's attorney, Mr. Fife explained that he assumed [Ms. F] would be willing to serve on the SCMS contract because [Ms. F] had expressed interest in a [ . . . ] position in support of deployed troops.  (Hr'g Tr. 35-36.)

At the end of the "bait and switch" proceedings, the Court afforded the agency an opportunity to reconsider or affirm its decision to award the SCMS contract to SOSi. (Hr'g Tr. 146-47.)  After a few minutes of discussion between DOJ counsel and agency counsel, the agency responded that it was quite comfortable with its award decision, and did not want to change it.  (Hr'g Tr. 152-53.)

Jurisdiction and Applicable Standards for Decision

A. Jurisdiction

Jurisdiction is a threshold matter that must be established before the Court can proceed to the merits of the case.  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-95 (1998).  The Court has jurisdiction over Fulcra's post-award bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(2006), as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. § 104-320, § 12(a)-(b) (1996).  The Act states that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract." § 1491(b)(1).  The Court of Federal Claims "shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded."  Id.

B. Standard of Review in Bid Protests

The Court reviews bid protests under the standards set out in the Administrative Procedure Act (APA), 5 U.S.C § 706.  See 28 U.S.C. § 1491(b)(4).  Under the APA, the Court will set aside the agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  A procurement may be set aside if:  (1) the procuring official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.  Id. at 1351.

In this case, Fulcra alleges that the contracting officer lacked a rational basis for his decision to award the contract to SOSi.  When a challenge is brought on this ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001) (citations omitted).  Agency decisions should be set aside as arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)).

This standard for review is "highly deferential."  Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009).  Agency actions "evincing rational reasoning and consideration of relevant factors" are upheld.  Id. at 1369 (quoting Advanced Data Concepts, Inc., 216 F.3d at 1058).  In a case where the decision has a reasonable basis, the Court "should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989).

Although the review is highly deferential, "it is not a rubber stamp."  Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 358 (2004); see also Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 742 (2000).  The Court is not required to accept bald assertions not tied to the administrative record.  Great Lakes Dredge & Dock Co., 60 Fed. Cl. at 358-59.  "Only by carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision can this court ensure that agency decisions are founded on a reasoned evaluation of the relevant factors."  Id. at 359 (citation omitted).

The plaintiff bears the burden of proving the arbitrary and capricious nature of the award by a preponderance of evidence.  PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006).  If the Court finds that the Government acted without a rational basis or contrary to law when awarding the contract, it then determines if the protester was prejudiced by that conduct.  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

### C. Standard for Judgment on the Administrative Record

Rule 52.1 of the Court provides for judgment on the administrative record. <u>DMS All-Star Joint Venture v. United States</u>, 90 Fed. Cl. 653, 660-61 (2010). In reviewing motions for judgment on the administrative record, the Court determines whether "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." <u>Id.</u> at 661 (citing <u>Bannum, Inc.</u>, 404 F.3d at 1356-57). Resolving motions for judgment on the administrative record is "akin to an expedited trial on 'the paper record'" <u>CHE Consulting, Inc. v. United States</u>, 78 Fed. Cl. 380, 387 (2007), <i>aff'd</i>, 552 F.3d 1351 (Fed. Cir. 2008). The Court may make findings of fact where necessary. <u>Bannum, Inc.</u>, 404 F.3d at 1356.

### D. Standard for Supplementation of the Administrative Record

In reviewing an administrative decision, the focal point of the review should be the administrative record already in existence, not some new record made initially by the reviewing court. <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973). However, the Court has discretion to supplement the record in limited circumstances. <u>Software Eng'g Servs., Corp. v. United States</u>, 85 Fed. Cl. 547, 552 (2009) (citing <u>Impresa</u>, 238 F.3d at 1338). The supplementation of the record should be limited to circumstances in which "the omission of extra-record evidence precludes effective judicial review." <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (citing <u>Murakami v. United States</u>, 46 Fed. Cl. 731, 735 (2000)). Before deciding whether to supplement the record, the Court must first evaluate whether supplementation is necessary in order not "to frustrate effective judicial review." <u>Id.</u> at 1381 (quoting <u>Pitts</u>, 411 U.S. at 142-43).

### Discussion

### A. Supplementation of the Administrative Record

#### 1. Supplementation Regarding the "Bait and Switch" Allegation

The Court has allowed supplementation of the record for Fulcra's "bait and switch" allegation. Specifically, the Court has supplemented the administrative record with the testimony presented at the December 14, 2010 evidentiary hearing. SOSi requests in its response to Fulcra's motion for judgment on the augmented record that the Court ignore the evidence presented at the evidentiary hearing. (Def.-Intervenor's Resp. Augmen. R. 20.)[4] The Court cannot ignore this evidence because it finds that the

---

[4] Because the briefing for this case was bifurcated between the motions for judgment on the administrative record for counts one through five and the motions for judgment on the augmented record for count six, there are two different sets of briefs. The Court will refer to the briefs on counts one through five as (Party Motion Admin. R. page number) and to the briefs on count six as (Party Motion Augmen. R. page number).

administrative record is insufficient to review the "bait and switch" allegation.  The administrative record contains the initial information that Fulcra relied upon to make its "bait and switch" allegation, but it does not contain all of the evidence that Fulcra later developed.  The Court cannot effectively review Fulcra's allegation without evaluating the evidence that Fulcra relies on to prove its allegation.  See Axiom Res. Mgmt., Inc., 564 F.3d at 1381 (holding that a court should determine if supplementation of record is required for effective judicial review).  As will be discussed in detail, the Court finds that the evidence presented at the evidentiary hearing was insufficient to show that a "bait and switch" occurred.  However, Fulcra's evidence from that hearing forms the basis for the Court's determination on this issue.  See Prot. Strategies, Inc v. United States, 76 Fed. Cl. 225, 236 (2007) (supplementing record with testimony on "bait and switch" allegation even though Court found that plaintiff could not prove the allegation).  SOSi's request that the Court reject the new evidence is denied.

## 2. Supplementation for the "Largely Similar" Allegations

The Court has not supplemented the record for the "largely similar" allegations.  Specifically, in its motion for judgment on the administrative record on counts one through five, Fulcra proposed to supplement the record with a declaration by [Mr. H], which Fulcra asserted would explain the quality and quantity of services provided under the bridge contract.  (Pl.'s Mot. Admin. R. 2, 11-13.)  In its reply brief on counts one through five, Defendant proposed to supplement the record with a copy of Fulcra's bridge contract and a chart comparing the current solicitation with the bridge contract to show that the new solicitation was different from the bridge contract.  (Def.'s Reply Admin. R. 6.)  In its sur-reply in support of its motion for judgment on the administrative record for counts one through five, Fulcra included a second declaration from [Mr. H] in which he opined that the two contracts were virtually identical.  (Pl.'s Sur-Reply Admin. R. 1-2.)  The Court finds that these additional documents are unnecessary for an effective review of the administrative record.  As will be discussed in greater detail below, the Court holds that Fulcra's interpretation of the evaluation criteria as mandating that the quantity and quality of the services be "largely similar" to the bridge contract was unreasonable.  Thus, any attempt by the parties to compare the two contracts is not helpful to the Court.  To the extent that Fulcra submits [Mr. H's] declaration to provide his views on the requirements of the statement of work, the Court holds that the solicitation itself provides the best information in this regard.  The Court does not need [Mr. H's] declarations to review the solicitation requirements.  See Terry v. United States, No. 09-454C, 2010 WL 5097776, at *11-12 (Fed. Cl. Dec. 15, 2010) (holding that supplementing the record with plaintiff's interpretation of the contract would not advance meaningful review because the best evidence of what the solicitation required was the document itself).  Accordingly, Fulcra's requests to supplement the record with two declarations from [Mr. H] are denied, and Defendant's request to supplement the record with a copy of the bridge contract and a chart comparing the bridge contract to the current contract is denied.

B.  Fulcra's Allegations Based on CENTCOM's Answer That the Effort Is
"Largely Similar" to the Bridge Contract

Fulcra's counts one through four of the complaint are all variations on the same
theme.  Fulcra contends that offerors were required to offer services "largely similar" to
the bridge contract and that at SOSi's low price, it could not possibly offer "largely
similar" services.  Fulcra's allegations stem from a single question and answer in
Amendment 002 to the solicitation:

Question: Are these services currently being performed through the bridge
contract W91GDW-10-C-0004?

Answer:  Yes, this effort is largely similar to the bridge contract W91GDW-10-C-
0004.

AR 260.   In a nutshell, Fulcra argues, based on CENTCOM's answer, that
"CENTCOM's decision [was] arbitrary and capricious [because] the agency has not
considered all relevant factors [nor] articulated a rational connection between the facts
found and the choices made . . . by omitting all consideration of the essential, let alone
"relevant,' factor of whether SOSi's proposed services were 'largely similar' to Fulcra's
incumbent services."     (Pl.'s Mot. Admin. R.  13.)  (internal quotation omitted).
Specifically, count one alleges that CENTCOM failed to follow the evaluation scheme by
finding SOSi's proposal technically acceptable when SOSi's proposal was not "largely
similar" to the bridge contract.  (Compl. ¶¶ 26-33; Pl.'s Mot. Admin. R. 9.)  Count two
alleges that CENTCOM must have relaxed the mandatory specifications by awarding the
contract to SOSi because the services offered by SOSi were not "largely similar" to those
in the bridge contract.  (Compl. ¶¶ 34-39, Pl.'s Mot. Admin. R. 9.)  Count three alleges
that Fulcra submitted its proposal on a different understanding of the requirements than
SOSi and CENTCOM should have informed Fulcra that the requirements had changed.
Fulcra based its understanding of the requirements on the "largely similar" language.
(Compl. ¶¶ 40-45, Pl.'s Mot. Admin. R. 9-10.)  Count four alleges that if CENTCOM
was willing to accept services that were not "largely similar" then there must have been a
latent ambiguity in the solicitation.  (Compl. ¶¶ 46-51, Pl.'s Mot. Admin. R. 10.)

All four of Fulcra's allegations fail because the phrase "largely similar" does not
deserve the great weight that Fulcra has assigned it.  In evaluating proposals, the agency
is required to review each proposal based on the criteria set forth in the solicitation.  The
administrative record demonstrates that the agency evaluated proposals in precisely this
manner.  Fulcra's interpretation of the solicitation would have amended the evaluation
criteria to add a vague requirement that all proposals be "largely similar" to Fulcra's
current bridge contract.  The Court finds this interpretation of the solicitation to be
unreasonable.  If Fulcra understood "largely similar" to change the evaluation criteria,

then "largely similar" added so much uncertainty to the solicitation as to create a patent ambiguity.  If a patent ambiguity existed, then Fulcra had a duty to inquire.

### 1.  The Agency Properly Followed the Stated Criteria in the Solicitation.

A solicitation must state all significant factors and subfactors that the agency will consider in evaluating proposals.  10 U.S.C. § 2305(a)(2)(A) (2006); FAR 15.304(d). Evaluators must base their decisions on these factors and subfactors.  Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 398 (2005); FAR 15.305(a); see also Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 386 (2003) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."), aff'd, 365 F.3d 1345 (Fed. Cir. 2004).  Under these rules, a procurement proceeds as follows:  the solicitation states all the significant factors and subfactors, the agency evaluates the proposals based on the factors and subfactors, and the contract is awarded to the offeror who best meets the criteria as described in the solicitation.

This is exactly how the agency conducted the evaluation in this case.  For the SCMS contract, the solicitation clearly stated that the lowest priced, technically acceptable offer would be selected.  AR 270.  The solicitation explained that "the lowest priced proposal evaluated as technically acceptable will be considered the successful offer and all remaining technical evaluations will cease."  Id.  Section M of the solicitation listed the evaluation factors and subfactors.  AR 271-73.  The solicitation explained that factors and subfactors would be rated acceptable or unacceptable, and if an offeror was rated unacceptable on any subfactor, the entire proposal would be rated unacceptable.  AR 271.  The Court's role is to determine whether the contracting officer followed the evaluation criteria in selecting SOSi as the awardee and whether the TET had a rational basis for determining that SOSi's proposal was technically acceptable.  See ITT Fed. Servs. Corp v. United States, 45 Fed. Cl. 174, 194 (1999) ("Generally, the case law provides that a contract award may not be upheld when the SSA improperly departs from stated evaluation criteria in a solicitation."); Beta Analytics Int'l, Inc., 67 Fed. Cl. at 399 (holding that questions about whether scoring of the technical evaluation was arbitrary require the Court "to discern a rational basis for [the agency's] treatment of the evidence").  The administrative record supports both of these determinations.  The contracting officer's award decision document demonstrates that the contracting officer used the LPTA method explained in the solicitation.  AR 617-18.  First, all six proposals were evaluated for price.  Id.  The TET then evaluated the lowest cost technical proposal. Id.  In his directions to the TET, the contracting officer explained that in evaluating proposals, the members of the TET "must determine whether or not the contractor's proposal meets the acceptability standards of the statement of work in accordance with Section M of the solicitation."  AR 275.  The contracting officer also pointed out that the evaluation should not be an assessment of how well the offeror addressed the requirements, but only if the offeror met the minimum requirements specified.  Id.

Following the TET's evaluation, the contracting officer evaluated past performance. Id. Because SOSi's lowest priced proposal was found to be technically acceptable with acceptable past performance, no other proposals were evaluated. Id.

The contracting officer also followed the proper procedure in performing the corrective action. After evaluating all six offerors for technical acceptability and past performance, the contracting officer awarded the contract to the lowest priced technically acceptable offeror. AR 622-30. The administrative record contains the evaluation documents for SOSi from the corrective action. AR 276-97. For each subfactor, each TET member indicated that SOSi's proposal was acceptable. Id. Some of the TET members also included positive comments on the proposal. Id. Fulcra has not pointed to anything in the evaluation documents that would lead the Court to believe that the TET's decision was not rational. Upon examination of the administrative record, the Court finds that CENTCOM made a reasonable decision in awarding the contract to SOSi.

2. "Largely Similar" Is a Vague and Imprecise Phrase.

The Court's review of the agency's decision on the basis of the stated evaluation criteria should be the end of the analysis and the award should be affirmed. However, Fulcra brought this case arguing that another requirement existed, that the proposal effort described must be "largely similar" to Fulcra's current bridge contract. In fact, Fulcra makes the phrase "largely similar" the centerpiece of its entire interpretation of the solicitation. To prevail on any of the first four counts in the complaint, Fulcra's interpretation of the solicitation must be reasonable. The Court finds just the opposite, that Fulcra's heavy reliance on the phrase "largely similar" was unreasonable.

Interpretation of the solicitation begins with the plain language of the document. Banknote Corp. of Am., Inc., 365 F.3d at 1353. A solicitation should be interpreted in a manner that harmonizes and gives reasonable meaning to all its parts. Id. "Provisions of a contract must be so construed as to effectuate its spirit and purpose." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). An interpretation which gives a reasonable meaning to all provisions of a solicitation will be preferred to one which leaves a portion of it useless or inexplicable. Id. Context thus defines the meaning of any given term or provision in a government solicitation. Linc Gov't Servs., LLC v. United States, No. 10-375C, 2010 WL 4484021, at *32 (Fed. Cl. Nov. 5, 2010) (citing Metric Constructors, Inc. v. NASA, 169 F.3d 747, 752 (Fed. Cir. 1999)).

The Court finds that Fulcra could not have rationally placed such heavy emphasis on "largely similar" to the exclusion of all else. The question posed to the agency in Amendment 002 to the solicitation simply was "[a]re these services currently being performed through the bridge contract W91GDW-10-C-0004?" The agency answered by stating "[y]es, this effort is largely similar to the bridge contract W91GDW-10-C-0004." AR 260. This answer could only have had meaning to Fulcra, since the agency did not

furnish the bridge contract to other offerors.  Moreover, the question did not ask the agency to compare the scope of work of the new solicitation with that of the bridge contract.  The agency's answer was an innocuous statement at most, not intended as a sweeping commentary comparing the respective scopes of work.  Yet, Fulcra has attempted to use this phrase to manufacture a protest where none really exists.

   3.   <u>If Fulcra's Interpretation of "Largely Similar" Is Correct, There Was a Patent Ambiguity Which Imposed a Duty to Inquire.</u>

If Fulcra believed that the phrase "largely similar" required offerors to compare the solicitation to the bridge contract, then the phrase gives rise to a patent ambiguity about which Fulcra had to inquire.  An ambiguity is patent if it is obvious, gross or glaring.  <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1162 (Fed. Cir. 2004).  The presence or absence of a patent ambiguity is determined by what a reasonable offeror would have perceived in studying the solicitation.  <u>Triax Pac., Inc. v. West</u>, 130 F.3d 1469, 1475 (Fed. Cir. 1997).  The best means of understanding the scope of the solicitation is to study the statement of work and analyze its requirements.  Under Fulcra's interpretation, only Fulcra would have had a full understanding of the scope of work because only Fulcra would have known what a proposal "largely similar" to the bridge contract would have looked like.  If Fulcra wished to compare the requirements of the new solicitation with those of the bridge contract, it could have prepared a detailed chart showing a side-by-side comparison of the respective statements of work.  Instead of making these careful comparisons, for Fulcra to assume that the agency had created an ambiguous evaluation standard requiring all offerors to write proposals "largely similar" to its proposal lacks any merit before the Court.  Fulcra should have inquired further of the agency if it wished to place such emphasis on the agency's phrase.  <u>See</u> <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (holding that if a solicitation contains a patent ambiguity, the offeror has a duty to seek clarification and a failure to do so precludes acceptance of the offeror's interpretation in any subsequent action against the Government).

   C.   <u>Fulcra's Price Realism Allegation</u>

Fulcra argues that CENTCOM's price realism analysis did not comply with the terms of the solicitation, and includes irrational assumptions and critical miscalculations.  (Pl.'s Mot. Admin. R. 25-26.)  Fulcra asserts that CENTCOM should have used one of three methods listed in the solicitation to find SOSi's price unrealistically low.  CENTCOM would then have had to either exclude SOSi's proposal or consider the low price in performing the technical evaluation.  (Pl.'s Reply Admin. R. 24.)  The Court finds, however, that CENTCOM had broad discretion in evaluating SOSi's price, and so long as it performed this evaluation reasonably, the Court will not disturb the agency's findings.

Generally, price realism is not considered in fixed price contracts because the contractor assumes the full risk and responsibility that the work can be performed for the price offered.  Int'l Outsourcing Servs., LLC v. United States, 69 Fed. Cl. 40, 47 n.7 (2005).  An agency may, at its discretion, perform a price realism analysis in the solicitation of fixed price proposals.  Id.  If an agency commits itself to a particular methodology in the solicitation, it must follow that methodology.  Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 359 (2009).  The Court's duty is to determine if the agency's price realism analysis was consistent with the evaluation criteria set forth in the solicitation.  Ala. Aircraft Indus., Inc.-Birmingham, 586 F.3d at 1375-76.  The Court reviews the price realism analysis to determine if it is rational.  Halter Marine, Inc. v. United States, 56 Fed. Cl. 144, 172 (2003) (citations omitted).  In order to be rational, it is not necessary to show that the price realism analysis was conducted with "impeccable vigor."  Id.  Rather, the analysis must show that the agency took into account the information available and did not make irrational assumptions or critical miscalculations.  Id.

The Court finds that CENTCOM rationally applied the price realism criteria to SOSi's proposal.  While the solicitation commits the agency to determine if a price is unrealistically low, the solicitation does not commit CENTCOM to any specific price analysis technique.  The solicitation says that the price analysis may include one of three techniques:  (1) a comparison with the other offerors' proposed prices, (2) a comparison with other contract prices for similar services, or (3) a comparison with the IGE.  AR 270-71.  Because it uses the word "may," the solicitation does not require the agency to use one of the listed techniques or any particular technique at all.  Furthermore, even though the solicitation suggests techniques on how to conduct a price analysis, the solicitation states no requirements on when and how a price may be found to be unrealistically low.  Under the solicitation, even if there is a difference between the proposal price and the price to which it is compared, nothing prevents the contracting officer from considering other factors in determining if a price is reasonable.  In his award decision document, the contracting officer compared SOSi's price to the IGE and the other offerors' proposed prices, but considering all the factors, found SOSi's price realistic.  The contracting officer determined that all the price proposals were lower than the IGE.  Id.  The lower prices were explained by changes in the statement of work from the old contract, specifically that a greater amount of work could be performed in the continental United States.  Id.  The contracting officer also noted the maturity of the effort and the reduced risk in the environment where the work would be performed.  Id.

In the corrective action effort, the contracting officer made a second price realism analysis.  AR 627-29.  Again, the contracting officer acknowledged that SOSi's price was significantly lower than the IGE and the next lowest, technically acceptable price, but determined that SOSi's price was nevertheless realistic.  Id.  The contracting officer found that SOSi's proposal demonstrated a high degree of familiarity and experience with the core tasks associated with SCMS services.  AR 627-28.  The contracting officer again

found that SOSi [ . . . ].  AR 628.  The contracting officer also explained that SOSi's price was lower because it relied heavily on capabilities developed to support other efforts.  AR 628-29.  The Court finds nothing contrary to the criteria set out in the solicitation or unreasonable in the agency's analysis.

### D. Fulcra's "Bait and Switch" Allegation

Fulcra alleges that SOSi misrepresented the availability of its key personnel, an allegation colloquially known as a "bait and switch."  (Pl.'s Mot. Augmen. R. 1.)  This allegation has been a bit of a moving target during the proceedings, with Fulcra asserting a "bait and switch" for different personnel as it learned more information.   At the December 14, 2010 evidentiary hearing, Fulcra based its case on the status of [Ms. F], Adam Fife, and [Mr. I].  The Court finds that, even after the allowance of discovery and the presentation of evidence, Fulcra has been unable to prove two of the necessary elements of a "bait and switch" allegation.

#### 1.  The Legal Standard for a "Bait and Switch"

This Court has established the standard required to demonstrate a "bait and switch."  A protester must show:

> (1) The awardee represented in its proposal that it would rely on certain specified personnel in performing the services; (2) the agency relied on this representation in evaluating the proposal; (3) it was foreseeable that the individuals named in the proposal would not be available to perform the contract work; and (4) personnel other than those proposed are performing services.

OAO Corp. v. United States, 49 Fed. Cl. 478, 481 (2001); See also Prot. Strategies, Inc., 76 Fed. Cl. at 235; Unified Architecture & Eng'g, Inc. v. United States, 46 Fed. Cl. 56, 64 (2000), *aff'd*, 251 F.3d 170 (Fed. Cir. 2000).

Defendant argues that the Court should summarily dismiss count six of the complaint because SOSi has not yet begun performance and therefore no "switch" in personnel has yet occurred.  (Def.'s Opp'n Augmen. R. 4-5.)  Defendant cites two cases in which this Court found that the plaintiff could not prove a "bait and switch" because no "switch" had occurred, L-3 Global Communications Solutions, Inc. v. United States, 82 Fed. Cl. 604, 612-13 (2008) and Protection Strategies, Inc., 76 Fed. Cl. at 235.  (Def.'s Opp'n Augmen. R. 4.)  These two cases are distinguishable because performance had already begun, and no switch had occurred; the awardee was performing the contract as stated in the proposal.  In L-3 Global Communications Solutions, Inc., plaintiff argued that there had been a "bait and switch" because the Coast Guard had allowed the awardee to use a Land Earth Station Operator other than the one specified in the request for

proposals. 82 Fed. Cl. at 612. The Court found there had been no "bait and switch" because the Coast Guard had refused to switch the Land Earth Station Operator and therefore the awardee was using the same Land Earth Station Operator as listed in the proposal. Id. at 612-13. In Protection Strategies, Inc., the Court found that there was no "bait and switch" because the two personnel plaintiff alleged were switched actually were serving in the capacities for which they were offered. 76 Fed. Cl. at 235. Thus, this case is not analogous to Defendant's cited cases. Instead, Defendant raises the issue of whether a plaintiff can ever bring a "bait and switch" allegation when performance has not begun.

In a case such as this, the Court does not find that a plaintiff should be prevented from asserting a "bait and switch" allegation simply because performance has not yet begun. Instead, the Court agrees with the reasoning in Consolidated Engineering Services that a plaintiff must demonstrate for the fourth element that personnel other than those proposed are or will be performing the services. Consolidated Eng'g Servs., Inc. v. United States, 64 Fed. Cl. 617, 633 (2005). In Consolidated Engineering Services, plaintiff alleged that the awardee engaged in a systematic "bait and switch" scheme. Among its allegations was that the awardee hired incumbent plaintiff's current project manager and never intended to use the person it identified as project manager in its proposal. Id. at 632. Performance had not yet begun in this case and it was not yet clear if the new manager would replace the key personnel designee. Id. at 622, 634-35. The Court rejected plaintiff's allegation regarding the new hire because "[the plaintiff] points to no probative evidence (other than the hiring itself) that indicates said new hires have been, or will be, substituted in the stead of [awardee's] current key personnel designees." Id. at 635. The opinion suggests that, if the plaintiff had been able to prove that a different person would be performing the contract, it could have prevailed on its allegation of "bait and switch." In accord with Consolidated Engineering Services, the Court finds that a plaintiff may try to demonstrate a "bait and switch" prior to the beginning of performance. In order to do so, a plaintiff must prove by a preponderance of the evidence that when performance begins, personnel other than those proposed will be performing the work.

### 2. Fulcra Was Unable To Prove That a "Bait and Switch" Occurred.

After Fulcra presented the "bait and switch" claim at the GAO, the contracting officer furnished a statement that he had no reason to believe SOSi would employ personnel other than those named in its proposal. AR 562. The Court agrees with Defendant that Fulcra has been unable to show a "bait and switch." Fulcra has been unable to prove either the third or fourth element of a "bait and switch" for any of the three persons at issue.

Fulcra's failure to prove the fourth element is particularly striking as to [Ms. F]. Fulcra provided no evidence tending to show that [Ms. F] will not actually perform the

SCMS contract.  From the evidentiary hearing, the Court concludes that [Ms. F] will be available to begin performing the contract upon its award.  Thus, even if Fulcra had shown that SOSi had been remiss in failing to contact [Ms. F] before providing her name in the proposal, Fulcra still could not have prevailed on the "bait and switch" allegation with regard to [Ms. F].  However, Fulcra was not able to prove the third element for [Ms. F] either.  The Court finds that SOSi had enough information to believe that [Ms. F] would be able to perform the contract.

For Mr. Fife, Fulcra alleges that SOSi's proposal failed to disclose that he only planned to stay in Iraq for a few months.  (Pl.'s Mot. Augmen. R. 14.)  Although Mr. Fife testified that he has started his own business, and no longer works for SOSi, (Hr'g Tr. 13, 32), Fulcra did not present any testimony on whether Mr. Fife will perform the SCMS contract as stated in SOSi's proposal.  Thus, Fulcra failed to prove that Mr. Fife would not be performing the SCMS contract.  Furthermore, the Court finds credible Mr. Fife's testimony that he would have stayed on the program for as long as the agency desired.  (Hr'g Tr. 50-51.)  Fulcra presented rebuttal testimony from [Mr. H] and [Mr. G].  [Mr. H] testified that Mr. Fife told him in 2009 he would not accept lengthy assignments abroad in order to spend time with his wife and young child.  (Hr'g Tr. 113-14.)  [Mr. G] testified that taking a job as Project Director was a step down for Mr. Fife, and [Mr. G] did not believe Mr. Fife would take a long-term assignment abroad.  (Hr'g Tr. 81-82.)  The Court finds this rebuttal evidence unpersuasive in light of Mr. Fife's testimony that he would have performed the contract as long as required by the agency.  Thus, regardless of whether Mr. Fife actually performs the SCMS contract after leaving SOSi, the inclusion of his name in SOSi's proposal was done in good faith.  The third element of foreseeability therefore is lacking.

For [Mr. I], Fulcra alleges only that SOSi's proposal suggests he would be a full-time employee on the SCMS contract, when in fact he was already [ . . . ] another contract.  (Pl.'s Mot. Augmen. R. 14.)  The Court finds these allegations baseless.  There is nothing from the description of [Mr. I's] role to indicate that he would be either full-time or part-time.  AR 21, AR 58-59.  Furthermore, the solicitation did not require [Mr. I's] position to be full-time.  Since SOSi did not make a representation that [Mr. I] would be full-time, there can be no misrepresentation as to his availability.

Fulcra failed to prove that SOSi's proposed key personnel would not perform the contract.  Even if Fulcra had provided evidence that even one of the proposed personnel would not perform, Fulcra still has not proven the third element of its claim.  The Court finds that Fulcra failed to prove a "bait and switch."

<u>Conclusion</u>

For the foregoing reasons, Defendant's and Defendant-Intervenor's motions for judgment on the administrative record, as supplemented, are GRANTED, and Plaintiff's

motions for judgment on the administrative record, as supplemented, are DENIED.  The clerk is requested to enter judgment for Defendant and Defendant-Intervenor.  No costs.

On or before January 28, 2011, counsel for the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential or other protected information, and submit to the Court proposed redactions to this opinion, if any, before it is released for publication.  Counsel are requested to minimize their requested redactions so that the Court may publish as much of the decision as possible.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge